## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | |
|---|---|
| **LAFAYE HARRIS** | ) |
| | ) |
| | ) |
| **Plaintiff** | ) |
| | ) **Civil Action No.19-643** |
| **v.** | ) **Injunctive Relief Requested** |
| | ) |
| **THE HOUSING AUTHORITY OF** | ) |
| **THE CITY OF PRICHARD** | ) |
| | ) |
| **Defendant** | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

**1.** Defendant Housing Authority of the City of Prichard is an agency of Prichard City government and, for all purposes of this litigation, a "state actor". While acting as an arm of the state this Defendant has chosen to accelerate the termination of Ms. Lafaye Harris' subsidized rental lease; and, as a consequence, seeks to force her and her four children upon the city streets. All because of an alleged breach of the Authority's undefined "no smoking" policy. This litigation is necessary in this Court because in the Authority's haste to terminate Ms. Harris' tenancy, it has denied her rights protected by the Due Process Clause of the United States Constitution; the

Housing Act of 1937; various Department of Housing and Urban Development process regulations; and, in derogation of its own rules and procedures.

**2.** Harris does not by this litigation seek to wage a frontal attack upon the Authority's: restriction on smoking in unauthorized areas.  Nor is she seeking an unfettered right to smoke anywhere and at any time. Plaintiff recognizes that there is no such "smoker's right". To date, no controlling authority has held that there is a constitutional right to smoke at all[1]. Harris seeks relief from this Court from the impending loss of a valuable property right; and, a recognition that the Defendant's acts constitute an unlawful "taking" of this valuable property right, in violation of both her procedural and substantive due process rights. Indeed, the various policy that the Defendant seeks to enforce doesn't apply to her at all.

## II Parties

 **3.**  Plaintiff Lafaye Harris (Harris) is single mother of four children, one of which is in college. Harris first moved into the Defendant's conventional public housing development in 2006, lived in a multi-family unit operated under the Authority's Hope 6 Housing Program.  On or about July 2013, Harris moved out of the Hope 6 development and moved into the Authority's NSP2 program and into a single family

---

[1] An argument could be advanced that there should be some restraint upon the government's right to regulate in this area, which borders on an individual's personal integrity and privacy. Such as the right, so far unregulated, to smoke in the privacy of one's own home, or the right to smoke in their automobile privately owned and occupied.  But resolution of this hypothesis is not necessarily for the relief to which Ms. Harris seeks.

4-bedroom unit in which she currently resides.  Large open spaces separate her from her adjacent neighbors. At all times relevant, Harris has been a subsidized tenant in a unit owned, run or managed by the Authority.  Because of her limited income and family size, Harris has no reasonable or viable alternative to subsidized housing, which will be lost to her should the Defendant not be restrained from its unlawful activities.

**4.**   Defendant, Housing Authority of the City of Prichard (hereinafter sometimes referred to as "the Authority," or "HACP") came into being under the provisions of the Housing Authorities Act No. 56, approved February 8, 1935 and Act No. 148, approved March 17, 1939, now termed the Code of Alabama of 1940[2]. The Authority is a public housing authority, as defined by 24 CFR § 5.100, as such it is required to comply with the non-discretionary rules and regulations promulgated by the Department Housing and Urban Development (HUD.

### III. Jurisdiction & Venue

**5.** Jurisdiction of the Court is invoked pursuant to 28 U.S.C. section 1331, section 2201, 2202.  This action arises as a result of the deprivation of  Harris'  property right entitlement to a fair hearing, prior to the termination of her subsidized residential lease, which right is guaranteed by the Fourteenth Amendment of the United States Constitution and 42 U.S.C. section 1983, which section permits the

---

[2] Source http://prichardhousing.com/history/

commencement, by any citizen of the United States,  to redress the deprivation, under color of state law, statute, ordinance, regulation, custom, or usage of rights, privileges and immunities secured by the United States Constitution. In addition to the procedural protections, inscribed in the Due Process provision of the Constitution, Harris seeks a declaration that as a matter of "substantive due process", she cannot be made to lose her valuable property right due to unattributed tobacco product debris found in her front yard.

**6.** Jurisdiction is also invoked pursuant to the provisions of 28 U.S.C. section 1343, this being an action to redress the deprivation of right secured by 42 U.S.C. section 1983, providing for liability to the party injured in an action at law, suit in equity, or other proper proceeding, including injunctive and declaratory relief.

**7.**   Venue is proper in this District under 28 U.S.C. § 1391(b) since the claims arose in this District, Defendant does business in this District, and all or a substantial part of the events giving rise to this action occurred in this District.

## IV. Historical Background of the Housing Program

**8.**   In 1937, Congress passed the Housing Act of 1937 (a/k/a Wagner- Steagall Act), which created the United States Housing Authority ("USHA") to aid in the construction of low-rent housing.

**9**. HUD, the administrative agency created to enforce and regulate the provisions of the Housing Act, was established on September 9,1965. Pursuant to HUD's organic

(enabling statute), 42 U.S.C. Chapter 44 (Department of Housing and Urban Development, 42. U.S.C. §§ 3531 - 3549), which establishes the agency, its functions, and its responsibilities, "all of the functions, powers, and duties of the [HHFA], of the [FHAD] and of the [PHAD]" were "transferred to and vested in" the Secretary of HUD. (42 U.S.C. § 3534).

10.  HUD, like other federal agencies, derives its authority to regulate and to promulgate rules from Congress.

11.   HUD's rule-making authority is found in Section 7(d) of the HUD Act, 42 U.S.C. § 3535, which is part of HUD's organic statute. Section 7(d) provides as follows:

> (d) DELEGATION OF AUTHORITY; RULES AND REGULATIONS: The Secretary may delegate any of his functions, powers, and duties to such officers and employees of the Department as he may designate, may authorize such successive redelegations of such functions, powers, and duties as he may deem desirable, and may make such rules and regulations as may be necessary to carry out his functions, powers, and duties.

### V. Historical Background of the Housing Authority of the City of Prichard

12. The Housing Authority of the City of Prichard (HACP) came into being under the provisions of the Housing Authorities Act No. 56, approved February 8, 1935 and Act No. 148, approved March 17, 1939[3].

---

[3] Source http://prichardhousing.com/history/

**13**.  Following these enactments, residents of the city filed a petition with the City Clerk, setting forth the need for safe and sanitary housing; and, a city authority to administer such housing. A public hearing was held January 29, 1940 and the City Council determined that unsanitary and unsafe dwellings did exist and that there was a need for a local housing authority and adopted a resolution so stating. Consequently, the Housing Authority of the City of Prichard was created[4].

**14.** HACP currently administers 307 units of Public Housing; 2598 Housing Choice Vouchers[5]; an excess of 400 additional rental units; as well as units developed for homeownership opportunities.[6]

### VI. Operative Facts

**15.**  On or about July 2006, Ms. Harris, then a single mother of three, entered into an annual lease with HACP for one of its conventional (or project based) multi-family units, situated at 625 Ossia Edwards Avenue. This unit was subject to a rent subsidy was dependent upon Harris' income and other factors.

**16.**  Because Harris was situated in the Authority's conventional housing, she was entitled to an automatic annual lease renewal, absent good cause.

**17.**  Harris' conventional housing lease, for the Ossia Edwards residence, was renewed yearly until June 2013.

---

[4] Id.
[5] Harris and her family is the holder of one of these vouchers.
[6] Id.

## (a). Neighborhood Stabilization Program 2

**18.** The Neighborhood Stabilization Program (NSP) was established by the US Congress for the purpose of stabilizing communities that have suffered from foreclosures and abandonment. NSP2, a term that references the NSP funds authorized under the American Recovery and Reinvestment Act (the Recovery Act) of 2009, provides grants to states, local governments, nonprofits and a consortium of nonprofit entities on a competitive basis SP funds may be used for activities which include, but are not limited to:

> **(i).** Establish financing mechanisms for purchase and redevelopment of foreclosed homes and residential properties;
> **(ii)**. Purchase and rehabilitate homes and residential properties abandoned or foreclosed;
> **(iii).** Establish land banks for foreclosed homes;
> **(iv)**. Demolish blighted structures;
> **(v)**. Redevelop demolished or vacant properties

**19.** During the month of January 2010, HACP was awarded $20 million in NSP2 funding. The funding was utilized in 13 targeted census tracts that have been impacted by high foreclosure and vacancy rates, population loss and high unemployment. The grant guidelines included a deadline to expend all funds by 2013. HACP utilized the funds, among other things, to:

> **(i).** Purchase and rehabilitate 46 abandoned or foreclosed properties;
> **(ii).** Demolish 100 blighted structures;

     (iii)    Redevelop 80 of the demolished/vacant lots as new construction home ownership (30 units) and rental (50 units) housing;

**20.**  Pursuant to this funding, HACP demolished the prior dilapidated housing and constructed the new properties in the area where Ms. Harris currently resides. Her residential unit was one of these single-family properties.

## (b) Harris Transfer to HACP's NSP2 Program
## Pursuant to a Housing Choice (Section 8) Voucher

**21.**  On July 1, 2019 Harris was permitted to transfer from her conventional public housing to the Authority's NSP2 program.

**22.**  The transfer was coupled with a voucher, issued to her by HACP's Section 8 Department and intended to serve as monthly rental assistance for the rent charged for her new unit[7].

**23.**  Considering  each of the successive lease signed by Harris with the Authority, none had a non-smoking provision.

**24.**  Similarly, Harris's Housing Choice recertification vouchers, issued annually, did not contain a non-smoking provision.

---

[7] Interestingly, HACP was both the owner of the NSP2 newly constructed housing occupied by Harris and was the principle funding source, from time to time giving itself nearly $1,000.00 rental from its Section 8 budget. In essence subsidizing its own property with the exchange money over which it controls.

## (c). HUD's No Smoking Policy

**25.**  In an effort to address potential hazards from exposure to second hand smoke, HUD promulgated a regulation titled: "Instituting Smoke-Free Public Housing, effective February 3,2017, codified at 24 CFR Parts 965 and 966 (the "Smoking Ban" or the "Ban").

**26.**  Pursuant to its rule making authority, HUD implemented its Smoking Ban, which required, not later than 18 months from the effective date of the Ban, each public housing agency ("PHA") administering public housing to implement and enforce a ban on the use of prohibited tobacco products in **all public housing living units**, indoor common areas in public housing, and in PHA administrative office buildings. This ban requirement also extends to all outdoor areas up to 25 feet from the public housing and administrative office buildings.

**27.**  This ban was addressed to and limited to multifamily housing clusters where tenants shared common walls and common use areas.

**28.**  The ban expressly did not extend to the Housing Choice or Section 8 Program administered by the local PHA. Nor was it intended to apply to single family units, isolated and apart from other family dwellings.

**29.**  Thus, Harris, as a Section 8 voucher holder, was not intended to be covered by the ban.

## (c). HACP's No Smoking Policy

**30.**  On or about June 14. 2018 when Harris went to the PHA administrative building to renew her lease, she was told that HUD had mandated that she sign an "no smoking policy addendum. She was given a two-page handout brochure published by HUD and labeled: "Smoke-Free policy, Information for residents".

**31.**  Under the threat of a loss of her rental subsidy should she not sign, Harris, on June 14, 2018, signed a single page document containing the following language:

### THE HOUSING AUTHORITY OF THE CITY OF PRICHARD
### SMOKE FREE HOUSING POLICY

**I,** _(name of signer)_____acknowledge receipt of the Housing
Authority's Smoke Free Housing Policy which will become effective on June 1, 2018.

I acknowledge that I have read and agree to abide by the Smoke Free Housing Policy and understand that it is included and has become a binding and enforceable part of my lease with the Housing Authority of the City of Prichard as well as the House Rules and that any violations of said policy will result in the following:

**First Offence—** The first documented occurrence will result in the issuance of a lease termination notice with the opportunity to cure as follows: the scheduling of an apartment inspection to ensure all activities deemed lease violations have completely ceased and the tenant has cleaned the apartment and surrounding area and removed all policy violating items covered under this policy's definition of "Smoking". This inspection will be conducted within fourteen (14) days of the date of the notice. If the tenant fails this inspection it shall be considered a Second Offense.

**Second Offense -** The second documented occurrence will result in a lease termination notice with the ability to cure as follows: A charge of $300.00 being assessed against the tenant to cover the cost of post tenancy cleaning and the scheduling of an apartment inspection to ensure all activities deemed lease violations have completely ceased and the tenant has cleaned the apartment and surrounding area and removed all policy violating items covered under this policy's definition of "Smoking". This inspection will be conducted within fourteen (14) days of the date of the notice. If the tenant fails this inspection it shall be considered a Third Offense.

**Third Offense -** The third documented occurrence within a 12-month period will result in Lease termination with no opportunity to cure.

**NOTE: Offenses are based on a revolving 12-month period. Offenses older than 12 months will not be considered when determining the number of offenses. (Emphasis Added).**

Tenant Signature:

A p a r t m e n t   N u m b e r :

D a t e :   _ _ _ _ _ _

FAILURE TO SIGN THE ATTACHED LEASE ADDENDUM/HOUSE RULES AMENDMENT AND/OR RETURN IT TO THE PROPERTY MANAGEMENT OFFICE IN A TIMELY MANNER WILL BE CONSIDERED A LEASE VIOLATION AND PUT YOU AT RISK OF EVICTION.

**33.** The above document was an adhesion contract.

**34.** Harris never received any further notice as to what items were covered by the policy or an identity of which smoking activities were permitted and which were disallowed.

**35.** The handout policy, referenced in paragraph 30 above, on two occasions assured tenants that they could continue smoking. There was no mention of disposal of or the placement of smoking paraphernalia.

### (d). Harris' First No Smoking Violation Notice

**34.** On April 9, 2019, Harris was visited by HACP's Property Manager, Chanda Pettway. She was advised by Pettway that "various evidence of smoking paraphernalia was observed on her front lawn. Notwithstanding disclaimer by

Harris, on this same day was served with a "Notice of Lease" violation.

**35.** Pettway, in refusing to accept Harris disclaimer, and accepting <u>as fact</u> that Harris was responsible, conclusively determined fault. No benefit of the doubt was given.

**36.** Nothing provided to Harris from the HACP put her on notice that tobacco paraphernalia found outside her home, of unknown origin, would be a violation of HACP's "No Smoking Policy".

**37.** The notice warned that a second policy violation will result in a $300.00 fine.

**38.** This notice did not advise Harris that if she disagreed with the decision that she could grieve the matter.

**39.** The information relied upon by HACP was legally insufficient to support a violation of the "No Smoking Policy".

**40.** On or about April 10, 2019 Harris contacted by telephone HUD's contact person for HACP, Vicky Gill, and was advised that HACP was not implementing HUD's policy and that she should ask for a grievance.

**41.** Pursuant to HUD's suggestion, Harris filed a layperson's request for a hearing.

**42.** Harris' request for further review was ignored.

### (d). Notice of Harris' Alleged Second and Final No Smoking Violation

**43.** On August 6, 2019, Harris was served with a letter signed by Property Manager Pettway, dated August 5, 2019. The letter was noticing her with a "No Smoking Violation". The letter alleged that one of Harris' visitors was observed in

her front yard smoking a cigar.  Because of this she was being accessed a $300.00 fine and given 30 days during which to pay. Nothing was stated concerning the consequences of not paying the fine within the 30-day period.

**44.**  On September 5, 2019 Harris hand delivered a letter to HACP's Executive Director requesting a Hearing or Informal conference where she might dispute the charges against her.  A copy of this letter was emailed to HACP's legal counsel.

**45.** This request was ignored.

**46.** On September 9, 2019 Harris received a letter, dated September 5, 2019 signed by Pettway advising her that effective immediately, she was being terminated from the NSP2 Program. This decision was being made because by the close of business on September 4, 2019 she had not paid the $300.00 fine. Harris was told to gather her personal belongings and turn in the key.

**47.** The September 5 letter did not inform Harris that she had a right to a hearing if she disputed the charges, nor did it inform her why she was not entitled to a hearing.

**48.** No subsequent communication form HACP or its counsel ever responded to Harris' request for a hearing, nor was Harris or her counsel ever informed why she would not be entitled to a hearing.

### (e). Conventional Public Housing Due Process Requirements

**49.** HUD Regulations required the HACP to provide Harris the following procedural protections before it terminated her tenancy: (a)  a written notice of termination

stating the reasons for the termination (24 CFR § 966.4(l)(3)); (b) a notice that Harris has an opportunity to resolve the problem at an informal conference with PHA officials (24 CFR §§ 966.4(n) and 966.54); (c) that if the informal conference did not resolve the dispute that Harris be given an opportunity for a formal grievance hearing before an impartial decision-maker (24 CFR §§ 966.4(n) and 966.52); that not relying upon her awareness that Harris was entitled to a notice of her rights to the informal conference and the formal grievance proceeding (24 CFR § 966.4(l)(3)(ii)); and that the grievance hearing must provide the basic safeguards of due process, including discovery of relevant records and regulations, representation by counsel, the right to confront and cross-examine adverse witnesses and the right to a written decision based on the record and specifying the reasons (24 CFR §§ 966.56(b) and 966.57(a)). With the exception of a harsh notice of lease termination, Harris was denied each of these due process procedural safeguards.

### (f). Housing Choice (Section 8) Due Process Requirements

50.  Housing Choice participants, such as Harris are entitled to minimum due process safeguards prior to the loss of their Housing Choice (Section 8) eligibility. These safeguards are found at 24 CFR § 982.555 and provide: **Informal hearing for participant.** (a)*When hearing is required:* **(1)** A <u>PHA</u> <u>must</u> give a <u>participant</u> <u>family</u> an opportunity for an informal hearing to consider whether the following <u>PHA</u> decisions relating to the individual circumstances of

a <u>participant</u> <u>family</u> are   in   accordance   with   the   law,   HUD   regulations
and <u>PHA</u> policies:    (iv) A    determination    to    terminate    assistance    for
a <u>participant</u> <u>family</u> because  of  the <u>family</u>'s  action  or  failure  to  act; (c)*Notice to
family*.  **(1)**    The <u>PHA</u> <u>must</u> notify   the <u>family</u> that   the <u>family</u> <u>may</u> ask   for   an
explanation of the basis of the <u>PHA</u> determination, and that if the <u>family</u> does not
agree  with  the  determination,  the <u>family</u> <u>may</u> request  an  informal  hearing  on  the
decision.  **(2)** *Discovery* – At such hearing the family <u>must</u> be given the opportunity
to examine before the <u>PHA</u> hearing any <u>PHA</u> documents that are directly relevant to
the hearing. The <u>family</u> <u>must</u> be allowed to copy any such document at the <u>family</u>'s
expense.  If  the <u>PHA</u> does  not  make  the  document  available  for  examination  on
request  of  the <u>family</u>,  the <u>PHA</u> <u>may</u> not  rely  on  the  document  at  the  hearing.  (5)
*Evidence*. The <u>family</u> <u>must</u> be   given   the   opportunity   to   present   evidence,
and <u>may</u> question any witnesses.

## CAUSES OF ACTION

### <u>Count 1:  Fourteenth Amendment Due</u>
### <u>Process Restraints Upon HACP</u>

Plaintiff repeats and realleges the allegations set forth in all prior paragraphs
of this complaint as set forth herein. Since there is only one Defendant, HACP, all
of the claims touch and concern the acts and/or omissions of this Defendant.

**51.**  The Fourteenth Amendment provides, in pertinent part: "No state shall . . . deprive any person of life, liberty, or property, without due process of law". . ." It is well established that certain government benefits give rise to property interests protected by the Due Process Clause."  Goldberg v. Kelly, <u>397 U.S. 254,</u>  (1970)). "To have a protected property interest in a given benefit, 'a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth,* <u>408 U.S. 564</u>, 577,  (1972)).

**52.**  This Circuit has recognized that Goldberg type due process protections apply with equal force to the loss of subsidized housing.  *Basco v. Machin*, 514 F. 3d 1177 (11th Cir. 2008), "This reasoning applies with equal force to public housing assistance provided pursuant to Section 8, where eligible participants rely on subsidies to meet their basic need for housing." See Footnote 7. Thus, Harris had a property right in continued subsidized housing, and access to a voucher which was entitled to constitutional protection.

**53.** Thus, notwithstanding the due process rights provided to the Plaintiff by federal law, federal regulations and the Defendant's own rules and policies, she has procedural due process rights protected by the 14 Amendment to the US Constitution.

**54.** The Plaintiff had a valuable property right/interest in the continuation of her Housing Choice Voucher and her NSP2 Program benefits (which includes access to her housing unit) . She had a further right to a pre-termination fair hearing (especially upon her request) before the termination of those benefits.

**55.** The Defendant denied Plaintiff the right to a pre-termination hearing and in doing so denied to her rights protected under the Fourteenth Amendment, the violation of which 42 U.S.C. § 1983 provides a remedy.

<b>Count 2: Defendant's Failure to Grant A<br>Hearing After Being Requested to Do So Violated<br>the Housing Act, as amended 42 U.S. C § 1437</b>

Plaintiff repeats and realleges the allegations set forth in all prior paragraphs of this complaint as set forth herein. Since there is only one Defendant, HACP, all of the claims touch and concern the acts and/or omissions of this Defendant.

**56.** The Housing Act at 42 U.S.A. § 1437D(k) (2) provides: shall secretary shall by regulation require each public housing agency receiving assistance under this chapter to establish and implement an administrative grievance procedure under which tenants will—**(2)** have an opportunity for a hearing before an impartial party upon timely request within any period applicable under subsection.

**57.** The Plaintiff had a valuable property right/interest in the continuation of her Housing Choice Voucher and her NSP2 Program benefits (which includes access to

her housing unit). She had a further right to a pre-termination fair hearing (especially upon her request) before the termination of those benefits.

**58.** The Defendant denied Plaintiff the right to a pre-termination hearing and in doing so denied to her rights protected under the Housing Act of 1937, as amended, the violation of which 42 U.S.C. § 1983 provides a remedy.

### Count 3: Defendant's Failure to Grant A
### Hearing After Being Requested to Do So Violated
### the HUD Implementing Regulation Found At 24 CFR § 982.555

Plaintiff repeats and realleges the allegations set forth in all prior paragraphs of this complaint as set forth herein. Since there is only one Defendant, HACP, all of the claims touch and concern the acts and/or omissions of this Defendant

**59.**  Pursuant to the directive of Congress, via the Housing Act of 1937, as amended, the Secretary of Housing and Urban Development promulgated  24 CFR § 982.555, which provides: **Informal hearing for participant.** (a)*When hearing is required:* **(1)** A PHA must give a participant family an opportunity for an informal hearing to consider whether the following PHA decisions relating to the individual circumstances of a participant family are in accordance with the law, HUD regulations and PHA policies: (including) (iv) A determination to terminate assistance for a participant family because of the family's action or failure to act.

**60.** The Plaintiff had a valuable property right/interest in the continuation of her Housing Choice Voucher and her NSP2 Program benefits (which includes access to her housing unit). She had a further right to a pre-termination fair hearing (especially upon her request) before the termination of those benefits.

**61.** The Defendant denied Plaintiff the right to a pre-termination hearing and in doing so denied to her rights protected under the above referenced HUD regulations, the violation of which 42 U.S.C. § 1983 provides a remedy.

## Count 4: <u>Conventional Public Housing<br>Due Process Requirements</u>

Plaintiff repeats and realleges the allegations set forth in all prior paragraphs of this complaint as set forth herein. Since there is only one Defendant, HACP, all of the claims touch and concern the acts and/or omissions of this Defendant.

**62**. HUD Regulations required the HACP to provide Harris the following procedural protections before it terminated her tenancy: (a)  a written notice of termination stating the reasons for the termination (24 CFR § 966.4(l)(3)); (b) a notice that Harris has  an opportunity to resolve the problem at an informal conference with PHA officials (24 CFR §§ 966.4(n) and 966.54); (c) that if the informal conference did not resolve the dispute that Harris be given an opportunity for a formal grievance hearing before an impartial decision-maker (24 CFR §§ 966.4(n) and 966.52); that not relying upon her awareness that Harris was entitled to a notice of her rights to

the informal conference and the formal grievance proceeding (24 CFR § 966.4(l)(3)(ii)); and that the grievance hearing must provide the basic safeguards of due process, including discovery of relevant records and regulations, representation by counsel, the right to confront and cross-examine adverse witnesses and the right to a written decision based on the record and specifying the reasons (24 CFR §§ 966.56(b) and 966.57(a)). With the exception of a harsh notice of lease termination, Harris was denied each of these due process procedural safeguards.

**63.** To the extent that Harris was a conventional housing tenant of HACP, because she resided in a residential unit owned by the Authority, notwithstanding her Housing Choice Voucher, she requested and was denied a fair hearing.

**64.** Harris had and so far, retains a valuable property right/interest in the continuation of her assisted housing. She had a further right to a pre-termination fair hearing (especially upon her request) before the termination of those housing benefits.

**65.** The Defendant denied to the Plaintiff the right to a pre-termination hearing, and in doing so, denied to her rights protected under the above referenced HUD regulations, the violation of which 42 U.S.C. § 1983 provides a remedy.

## Count 6.: Substantive Due Process Violation with Respect
## to HACP's First Lease Violation Notice

Plaintiff repeats and realleges the allegations set forth in all prior paragraphs of this complaint as set forth herein. Since there is only one Defendant, HACP, all of the claims touch and concern the acts and/or omissions of this Defendant.

66.  The Due Process Clause of the Fourteenth Amendment provides, "No state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Clause "extends beyond the command of fair procedures" and comprises a "substantive component as well." *County of Sacramento v. Lewis*, 523 U.S. 833, 856, 118 S. Ct. 1708, 1721 (1998) (Kennedy, J., concurring).  Substantive due process has two strands—one that protects against deprivation of fundamental rights and one that protects against arbitrary governmental decision-making resulting in the loss of property.

67.  HACP's, which is an instrument of state government, initial decision to find Harris in violation of its "No Smoking" policy, due to discovery of tobacco debris on her lawn, was "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  As such, it was violative of Harris' substantive due process rights, of which 42 U.S.C §1983 provides a remedy.

## Count 7: The Second Violations' $300.00 Penalty
## Provision of HACP's Smoke Free Policy Is Arbitrary
## and Capricious and Violative of Substantive Due Process

Plaintiff repeats and realleges the allegations set forth in all prior paragraphs of this complaint as set forth herein. Since there is only one Defendant, HACP, all of the claims touch and concern the acts and/or omissions of this Defendant.

**68.** HACP's second notice of an alleged violation demanding a $300.00 payment, was expressly premised upon imagined out of pocket expenditures, or expected expenditures. One of these expenditures addresses is a hypothetical "post tenancy" cleaning and inspection costs. This is an assessment before the fact which bore no relationship to the actual facts. There may be no cleaning expenditures. Indeed, such expenditures may be already covered by the security deposit.  Importantly, if there is a termination of tenancy on the second violation, why is the tenant charged a cleanup fee?  There are some categories of smoking infraction (such as smoking within 25 feet of a protected dwellings,) which has nothing to do with an inspection and no such costly inspection will be necessary.  What if, as here, the alleged smoking infraction had nothing to do with the interior of the unit, or any potential cost to HACP. Is this intended as a penalty? Expressly, it is not. Thus, this charge is arbitrary and capricious.   Arbitrary and capricious decisions of administrative agencies run afoul of the Due Process clause and are of no effect and the relief from which 42 U.S.C §1983 provides a remedy.

## Count 8: HACP Refusal to Notice the Right to Hearing, or Grant a Requested One, Violated its Own Policies and Was Violative of Due Process

Plaintiff repeats and realleges the allegations set forth in all prior paragraphs of this complaint as set forth herein. Since there is only one Defendant, HACP, all of the claims touch and concern the acts and/or omissions of this Defendant.

**69.**  HACP Housing Choice Administrative Plan, prepared as a requirement of HUD funding and/or continued funding, provides, in important part:

> **Chapter 10**
>
> **INFORMAL REVIEWS AND HEARINGS**
> A. Introduction
> Families seeking admission to or already participating in the HCVP have the right to receive an informal review or hearing when the HA makes a decision that has a negative impact on a family. For applicants, the appeal takes the form of an informal review. For participants, or for applicants denied admission because of citizenship issues, the appeal takes the form of an informal hearing. The purpose of the informal review or hearing is to resolve the applicant's or participant's disputes with the HA without legal action and to correct errors the HA may have made in its decisions-making activities.
>
> B. Notification of Rights
> Following all HACP actions or decisions that require that HACP offer the family an opportunity for informal review or hearing, HACP will provide the applicant or participant family prompt written notice of the family's right to ask for an informal review or informal hearing to determine if the HACP decision is in accordance with the law, HUD regulations, and HACP policies.

**70.**  Constitutional due process requires agencies to follow their own non-legislative rules. The constitutional due process theory holds that such rules "embody *a de facto* recognition of minimum standards of procedural decency" 'or, more broadly, that

agency rule violations deny fundamental fairness. See generally *Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

**64.**   Harris had and so far, retains a valuable property right/interest in the continuation of her assisted housing. She had a further right to a pre-termination fair hearing (especially upon her request) before the termination of those housing benefits.

**65.** The Defendant denied to the Plaintiff the right to a pre-termination hearing, and in doing so, denied to her rights protected under its' own administrative procedure, the violation of which 42 U.S.C. § 1983 provides a remedy.

    **WHEREFORE**, Plaintiffs pray for judgment as follows:

  **A.** That the Court recognize and take jurisdiction over this cause:

  **B.** That the Court, after a hearing, issue a Declaration that the Defendant's failure to notify the Plaintiff that she had rights to challenge its decision to terminate her tenancy, violated due process;

  **C.** That the Court, after a hearing, issue a Declaration that the Defendant's refusal to grant Plaintiff a fair and impartial hearing violated her due process rights;

  **D.** That the Court, after a hearing, issue a Declaration that as a matter of substantive law, tobacco debris found in Plaintiff's yard is not a violation of HUD's "No Smoking" regulations and was not a breach of the Defendant's

vague smoking policy and as such was arbitrary and capricious and violative of substantive due process;

**E.** That the Court, after a hearing, issue a Declaration that the Defendant's practice of charging a $300.00 penalty for any second smoking violation is confiscatory, arbitrary, capricious and in violation of substantive due process.

**F.** That the Court, after a hearing, issue a Declaration holding that making the Plaintiff responsible for the innocent and lawful behavior of a guest, the presence of which she was unaware and whose conduct she could not control, was arbitrary and capricious and violative of substantive due process.

**G.** That the Court, after a hearing, issue an injunction compelling the Defendant to grant the Plaintiff a fair hearing as required by due process;

**H.** That the Court, after a hearing, issue an injunction, enjoining the Defendant from evicting the Plaintiff for any of the contentions raised in this Complaint;

**I.** Award the Plaintiff her reasonable attorney fees and costs as provided by 42 U.S.C.§ 1988 and other appropriate fee shifting statutes;

**J.** Award such other relief as may be just and proper

Dated September 16, 2019

S/s Ishmael Jaffree
Ishmael Jaffree (JAF 002)
Attorney for the Plaintiff
104 St. Francis St. Suite 700
Mobile, Alabama 36602